# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
John O. Juroszek

ELBA TOWNSHIP v GRATIOT COUNTY DRAIN COMMISSIONER

Docket No. 144166.  Argued January 9, 2013 (Calendar No. 6).  Decided April 9, 2013.

Elba Township brought an action in the Gratiot Circuit Court against the Gratiot County Drain Commissioner seeking to enjoin the commissioner from consolidating the drainage districts associated with the No. 181-0 drain and its tributary drains.   Elba Township argued that the consolidation proceedings had violated the Drain Code, MCL 280.1 *et seq*., because the No. 181-0 drain petition for consolidation lacked the statutorily required number of freeholder signatures and the notice of the hearing by the board of determination had been deficient.  David Osborn, Mark Crumbaugh, Cloyd Cordray, and Rita Cordray (the Osborn plaintiffs) intervened in the action, similarly seeking declaratory and injunctive relief and claiming that the petition was defective and that the notice of the meeting of the board of determination was defective, resulting in a violation of their due process rights.  With regard to the due process claim, the Osborn plaintiffs' primary complaint was that some of the property that would be affected by the drainage project lay outside the townships listed in the notice, although the notice stated that it was being sent to persons liable for an assessment.  The drain commissioner moved for summary disposition, arguing that the appropriate number of signatures had been gathered and that the notice given appropriately informed those affected by the proposed consolidation of the date, time, and place of the board-of-determination hearing.  Elba Township and the Osborn plaintiffs filed a cross-motion for summary disposition.  The court, Randy L. Tahvonen, J., granted the drain commissioner's motion, finding that under MCL 280.191, only 5 freeholder signatures were required on the petition rather than the 50 signatures the township claimed were required under MCL 280.441.  Elba Township and the Osborn plaintiffs appealed.  The Court of Appeals, M. J. KELLY, P.J., and FITZGERALD and WHITBECK, JJ., affirmed the trial court's exercise of equitable jurisdiction, but reversed on the merits.  294 Mich App 310 (2011).  The Supreme Court granted the drain commissioner's application for leave to appeal.  491 Mich 924 (2012).

In an opinion by Justice MARKMAN, joined by Chief Justice YOUNG and Justices CAVANAGH, MARY BETH KELLY, ZAHRA, and McCORMACK, the Supreme Court *held*:

The remedy for a failure to comply with the requirements of the Drain Code is certiorari review.  Courts may exercise equitable jurisdiction over disputes involving a failure to follow the requirements of the Drain Code only if the failure is so egregious that it implicates constitutional concerns.

1. A party aggrieved by any part of the proceedings in establishing any drain and levying taxes for the drain may seek certiorari review under MCL 280.161. A writ of certiorari (which under MCR 3.302(c) has been replaced by the superintending control order) for any error occurring before or in the final order of determination must be issued within 10 days after a copy of the final order is filed in the office of the drain commissioner, and for any error occurring after the final order of determination, within 10 days after the day of review, or if an appeal has been taken, within 10 days after the filing of the report of the board of review. Under MCL 280.161, if no certiorari is brought within the time prescribed by statute, the drain will be deemed to have been legally established, and the taxes for the drain legally levied, and the legality of the drain and the taxes may not thereafter be questioned in any suit at law or equity. Nevertheless, Michigan courts have historically been permitted to exercise equitable jurisdiction when a plaintiff alleges a constitutional infirmity in the proceedings surrounding a drainage project. A failure to follow the requirements of the Drain Code will not warrant the exercise of equitable jurisdiction unless the failure is so egregious that it implicates constitutional concerns, which will almost always involve the deprivation of property without due process of law. The remedy for failure to comply with the technical requirements of the Drain Code is certiorari review, and any error in this case concerning the signature requirements for the petition was amenable to correction on certiorari review. Accordingly, certiorari was the exclusive avenue of review for that claim, and both lower courts erred by reaching the merits of the signature-requirement issue.

2. True questions of due process may be heard in equity because they implicate the constitutional exception to MCL 280.161. To comport with due process, notice, when required, must be reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. In this case, while it was within the lower courts' equitable jurisdiction to address the notice issue, due process did not require that any notice be given regarding the meeting of the board of determination because the meeting did not pertain to deprivation of life, liberty, or property. Rather, it pertained to the propriety of the drainage project under the Drain Code, which requires that the project be necessary and conducive to public health, convenience, or welfare. Property owners who might be assessed for a drainage project are not constitutionally entitled to notice regarding proceedings to determine the necessity and conduciveness of a drainage project; they are constitutionally entitled, however, to notice regarding assessment proceedings for the drainage project. Plaintiffs thus were entitled to notice that the subsequent day of review concerning apportionment of benefits of the project would be held, and they received that notice.

Court of Appeals' judgment reversed; trial court order granting summary disposition in favor of defendant reinstated.

Justice VIVIANO took no part in the decision of this case.

©2013 State of Michigan

# Opinion

Chief Justice:          Justices:
Robert P. Young, Jr.    Michael F. Cavanagh
                        Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano

FILED APRIL 9, 2013

S T A T E   O F   M I C H I G A N

SUPREME COURT

ELBA TOWNSHIP,

        Plaintiff-Appellee,

and

DAVID L. OSBORN, individually and as
Trustee of the Osborn Trust, MARK
CRUMBAUGH, CLOYD CORDRAY, and
RITA CORDRAY,

        Intervening Plaintiffs-
        Appellees,

v                                                No. 144166

GRATIOT COUNTY DRAIN
COMMISSIONER,

        Defendant-Appellant.

BEFORE THE ENTIRE BENCH (except VIVIANO, J.)

MARKMAN, J.

The issues presented here are (1) whether the lower courts properly exercised
equitable jurisdiction with regard to this case and, if so, (2) whether the Drain Code requires

5 or 50 signatures for a drainage-district consolidation petition, and (3) whether the notice given regarding a drainage "board of determination" hearing satisfied the constitutional requirements of due process. We conclude that the lower courts improperly exercised equitable jurisdiction over the signature-requirement question but properly exercised such jurisdiction over the question of notice. The former question is purely statutory and, as such, there were no grounds on which the lower courts could properly exercise equitable jurisdiction. Though the exercise of equitable jurisdiction over the latter question was proper, we conclude that constitutional due process did not entitle plaintiffs to receive notice of the "board of determination" hearing. Accordingly, we reverse the judgment of the Court of Appeals and reinstate the trial court's order granting summary disposition for defendant.

## I. DRAIN CODE

The first drain laws were enacted before Michigan became a state. See 2 Territorial Laws, Act of March 30, 1827, § 19, p 325. Amended frequently during the nineteenth and early twentieth centuries, our drain laws have historically served the public purposes of promoting the productive use of the state's land resources and combatting the spread of water- and mosquito-borne diseases, such as cholera and malaria. See 1846 RS, ch 131, § 1 (stating that before a ditch may be constructed through an individual's land against his will, the township board must inquire whether the "marsh, swamp or other lands [to be drained by the ditch] are a source of disease to the inhabitants, and whether the public health will be promoted by draining the same"); Kaplowitz & Popp, *Occupying the same wetland: Michigan's Drain Code and the federal Clean Water Act*, 77 U Det Mercy L R 779, 781-785 (2000). In light of the importance of these functions, those governmental officials charged at

2

various stages of our state's history with overseeing the construction and maintenance of drains have been accorded fairly sweeping powers subject only to limited judicial review. The present Drain Code (the Code), based in large part on these early statutes, retains these characteristics. MCL 280.1 *et seq.* That the Code is based on these early statutes is likely also one of the reasons why the Code constitutes one of the more arcane portions of Michigan statutory law. See *Eyde v Lansing Twp*, 109 Mich App 641, 645; 311 NW2d 438 (1981) ("[T]he Drain Code of 1956 [is] an exceedingly complex statute, the provisions of which apparently are known by few in the profession and understood by far fewer.") (citations and quotation marks omitted) (emphasis omitted). Thus, before proceeding to the facts and procedural history of this case, we first discuss applicable portions of the Code.

Under the Code, a "drain" is essentially any watercourse (whether natural or artificial, above or below ground) and the structures or mechanical equipment used to control the flow of that watercourse (excluding certain power-generating dams and the flowage rights used in connection therewith). MCL 280.3. A "drainage district" is the area in which the drain operates. It is "a body corporate with power to contract, to sue and to be sued, and to hold, manage and dispose of real and personal property, in addition to any other powers conferred upon it by law." MCL 280.5. But the distinction between a drain and a drainage district is not as clear as this definitional scheme might suggest. In fact, the two terms are often used interchangeably. Both the Court of Appeals and litigants at times use the terms interchangeably, and even the Drain Code itself sometimes fails to distinguish between the two concepts. See, e.g., MCL 280.446 (discussing consolidation of a "drain" with a "consolidated drain" in chapter 19 of the Drain Code, entitled "Consolidated Districts").

3

When an existing drain needs maintenance or improvement, property owners "whose lands shall be liable to an assessment for benefits of such work" may petition for the work to be done. MCL 280.191. If consolidation of drainage districts is sought, property owners whose lands lie within the districts that would be consolidated may also petition for consolidation. MCL 280.441(1). In either situation, after the petition is submitted, the county drain commissioner "may appoint a board of determination composed of 3 disinterested property owners," MCL 280.72(1) and MCL 280.441(1), to determine, in the case of proposed maintenance or improvement, whether the maintenance or improvement would be "necessary and conducive to public health, convenience, or welfare," MCL 280.72(3), or in the case of proposed consolidation, the "necessity of the consolidation," MCL 280.441(1), and whether the consolidation would likewise be "conducive to public health, convenience, or welfare," MCL 280.441(3).[1]

If the "board of determination" (the Board) makes the requisite findings of necessity and conduciveness, then, in the case of a consolidation of drainage districts, an order of consolidation is given to the county drain commissioner, who files the order and gives the new consolidated district a name or number. MCL 280.441(3). In the case of drain maintenance or improvement, once the Board has made its findings, the county drain commissioner then files a final order of determination specifying the precise work to be done. MCL 280.151. The drain commissioner also then apportions the benefit created by

---

[1] MCL 280.72 deals with the process by which *new drains* may be sought and established. But MCL 280.191, which deals with the process by which *maintenance and improvement* of drains may be sought and effected, provides that the MCL 280.72 requirements for a "board of determination" finding of necessity and conduciveness govern proceedings under MCL 280.191 as well.

4

the maintenance and improvement among the benefitted properties on a percentage basis.[2]

MCL 280.151. "All apportionments of benefits . . . shall be upon the principle of benefits derived." MCL 280.152. The assessment of taxes to pay for the drain work is then based on these percentage apportionments. MCL 280.151.

Once this apportionment process is complete, each person who owns property within the district to be assessed is given notice that a public meeting (i.e., a day of review) will be held to review the apportionment of benefits.[3] MCL 280.154(3) and MCL 280.191. Anyone aggrieved by the apportionment may "appeal therefrom and . . . make an application to the probate court . . . for the appointment of a board of review . . . ." MCL 280.155. A party aggrieved by any part of "[t]he proceedings in establishing any drain and levying taxes therefor" can also seek certiorari review.[4] MCL 280.161. But

> [a] writ of certiorari for any error occurring before or in the final order of determination shall be issued within 10 days after a copy of such final order is filed in the office of the drain commissioner . . . , and for any error occurring after such final order of determination, within 10 days after the day of review,

---

[2] The commissioner also determines at this time the percentages of the cost of the project that will be assessed against any "township, city, or village," any "highway then under control of the county or district road commissioners," and any "state trunk line highway." MCL 280.151.

[3] MCL 280.191 provides that, after the final order of determination has been filed, and if the apportionment is not "the same as the last recorded apportionments," then "the commissioner shall proceed as provided in [MCL 280.151 to MCL 280.161], including the notice of and the holding of a day of review." Otherwise, no day of review is necessary.

[4] Though the Drain Code provides for "certiorari," under MCR 3.302(C), "[a] superintending control order replaces the writ[] of certiorari . . . when directed to a lower court or tribunal." To maintain consistency with the statute and historical caselaw, however, "certiorari" is used throughout this opinion.

5

or if an appeal has been taken within 10 days after the filing of the report of the board of review.  [MCL 280.161.]

No other avenue of review is contemplated by the statute.  "If no certiorari be brought within the time herein prescribed, the drain shall be deemed to have been legally established, and the taxes therefor legally levied, and the legality of said drain and the taxes therefor shall not thereafter be questioned in any suit at law or equity[.]"  *Id.*  But by long-established precedent, discussed more thoroughly later in this opinion, aggrieved parties nevertheless have been permitted to challenge drain proceedings in equity on the sole bases of fraud or constitutional infirmity.

## II.  FACTS AND HISTORY

The No. 181-0 drain is a major, established drain located in Gratiot County.  It is fed by dozens of established tributary drains, each of which lies within its own separately established drainage district.  Each of these tributary-drain drainage districts in turn lies within the boundaries of the separately established No. 181-0 drain drainage district.  This appeal involves a challenge to maintenance and improvements on the No. 181-0 drain and several of its tributaries, along with the consolidation of all the tributary-drain drainage districts and the No. 181-0 drain drainage district into a single new drainage district.

In March 2009, Dennis Kellogg filed with defendant, the Gratiot County Drain Commissioner (the Commissioner), a petition signed by five property owners from North Star Township.  The Kellogg petition sought the consolidation, maintenance, or improvement of the "#181-0 Drain and all established tributary drains located and established in the Townships of Northstar, Washington & Elba, in the County of Gratiot, State of Michigan."  Prior to receiving the Kellogg petition, the Commissioner had received

6

two petitions for consolidation, maintenance, or improvement of two drains that are tributaries to the No. 181-0 drain. A petition for consolidation, maintenance, or improvement of yet another tributary drain to the No. 181-0 drain was received after the Kellogg petition. In response to these petitions, and with the advice of a consultant hired to study the situation, the Commissioner determined that the best course of action was to undertake a major maintenance and improvement project involving No. 181-0 and several of its tributaries and to consolidate all the separate drainage districts into a new No. 181 consolidated drainage district. The Commissioner appointed a Board to hear evidence and determine the propriety of the proposed actions, and the Board held a hearing on May 4, 2010.[5]

All municipalities located within the No. 181-0 drain drainage district-- including plaintiff Elba Township-- were notified of the date, time, and place of the hearing. Additionally, a notice was sent to all the individual property owners and published in the *Gratiot County Herald*. It stated:

> *Notice Is Hereby Given* to you as a person liable for an assessment that the Board of Determination . . . will meet on Tuesday, May 4, 2010 at 10:00 A.M., o'clock in the forenoon, North Star Township Hall located at 2840 E. Buchanan Road, North Star Township, Michigan to hear all interested persons and evidence and to determine whether the drain in *Drainage District No. 181-10*[6] *Wolf & Bear known as the #181-10 Wolf & Bear Drain*, as prayed for in

---

[5] Because the May 4, 2010 hearing was held as part of the May 4, 2010 Board meeting, this opinion refers to the May 4, 2010 proceedings variously as a "hearing" and a "meeting."

[6] The discrepancy between the notice, which refers to the No. 181-10 drain, and the petition, which referred to the No. 181-0 drain, has never been satisfactorily explained by the parties. That the drainage system was ultimately consolidated into a new drain known simply as No. 181 further complicates an already byzantine drain-and-drainage-district identification scheme. On one hand, some information indicates that the reference to No. 181-10 in the

7

the Petition for consolidating, cleaning out, relocating, widening, deepening, straightening, tiling, extending or relocating along a highway, *and all established tributary drains, located and established in the Township(s) of Elba, Sections 18 & 19, North Star Sections 25, 26, 27, 28, 29, 32 and 36, Washington, Sections 1, 12, 23 and 24, County of Gratiot, State of Michigan.*[7] Petition further shows that . . . said consolidating, clearing out, relocating, widening, deepening, straightening, tiling, extending or relocating along a highway of the drains is necessary and conducive to the public health and welfare of Elba, North Star and Washington Township(s). Dated March 23, 2009 . . . and for the protection of the public health of the following: Elba, North Star and Washington Township(s).

* * *

You Are Further Notified, that persons aggrieved by the decisions of the Board of Determination may seek judicial review in the Circuit Court for the County of Gratiot within ten (10) days of the determination. [Emphasis altered.]

At the meeting, the Board voted 2-1 to approve the project as necessary and conducive to public health, convenience, or welfare. Following the meeting, the Board prepared and filed an "ORDER OF NECESSITY" with the Commissioner's office. The order listed the "#181-10 drain and all established tributary drains, located and established in the township(s) of Elba, sections 18 & 19, North Star sections 25, 26, 27, 28, 29, 32 and 36, Washington, sections 1, 12, 23 and 24, County of Gratiot, State of Michigan . . . ."

---

notice was a clerical error. According to the Commissioner, "[t]he Notice printed '#181-10' because it was generated by commonly-used assessing software. The '10' references 2010, which was the latest year of assessment." On the other hand, plaintiffs indicate that No. 181-10 was the original focal point of the project and was a tributary to the No. 181-0 drain.

[7] That this crucial portion of the notice is not a grammatically functional sentence makes interpretation of the notice more difficult.

8

The Commissioner filed a final order of determination for the project on December 22, 2010.[8] On January 5, 2011, the Commissioner mailed to each property owner in the new No. 181 consolidated-drain drainage district notice that a day of review would be held regarding the apportionment of benefits from the project. The day of review was held on February 14, 2011. No appeal to the probate court for a board of review was taken, nor was certiorari review sought.

The present lawsuit was commenced after the initial Board proceedings but before the Commissioner filed the final order of determination. On November 8, 2010, Elba Township (Elba) filed a complaint against the Commissioner in the Gratiot Circuit Court. Elba alleged that the consolidation violated the Drain Code because the petition for the action had been signed by only 5 property owners, rather than the 50 that Elba contended the Code required. Elba also asserted that the notice of the May 4, 2010 Board hearing was defective and therefore did not comport with due process. The Commissioner moved for summary disposition. Then, David Osborn, Mark Crumbaugh, Cloyd Cordray, and Rita Cordray

---

[8] Other events transpired between the Board's filing of its initial order of necessity and the Commissioner's filing of his final order of determination. In September 2010, the Commissioner sent out notifications of at-large assessments to all municipalities located within the new No. 181 consolidated-drain drainage district. According to the Commissioner, after the notices were mailed, he determined that adding more land to the new drainage district might be necessary. Thus, in November 2010, he issued a notice of "RECONVENED BOARD OF DETERMINATION." Included in the notice this time around was a list of all 47 drainage districts consolidated at the May 4, 2010 hearing "known as the No. 181 Consolidated Drain in the Townships of Elba, Fulton, Hamilton, Newark, North Star and Washington . . . ." The notice provided that the reconvened hearing would be held on November 11, 2010, to determine the necessity of adding lands to the No. 181 consolidated-drain drainage district. The Commissioner sent the notice of the reconvened hearing to all the municipalities and individual property owners within the drainage district. The hearing was held and the additional land added by way of a revised order of necessity.

9

(collectively, the Osborn plaintiffs) moved to intervene as of right.[9]  These individual property owners filed a complaint alleging that the notice issued regarding the May 4, 2010 Board meeting failed to properly inform them that their property was part of the proposed project and thus the Commissioner had violated the Drain Code and their due process rights. The motion to intervene was granted, and the Commissioner then moved for summary disposition of the Osborn plaintiffs' claims as well.  Elba and the Osborn plaintiffs (collectively, plaintiffs) filed a cross-motion for summary disposition in their favor.  The trial court granted summary disposition for the Commissioner on both the signature and notice issues.

The Court of Appeals affirmed the trial court's exercise of jurisdiction but reversed on the merits.  It held that a proper reading of the Drain Code required 50 signatures for a consolidation petition and that the information contained in the notice of the May 4, 2010 hearing was misleading and thus violative of due process.  Though the Drain Code severely circumscribes the avenues of relief available to plaintiffs, the Court of Appeals held that the signature deficiency allowed it to exercise equitable jurisdiction because the failure to secure the needed signatures meant that there was an "entire lack of jurisdiction" on the part of the Commissioner to undertake the project.  *Elba Twp v Gratiot Co Drain Comm'r*, 294 Mich App 310, 341; 812 NW2d 771 (2011).  The Commissioner applied for leave to appeal here. We granted leave and heard oral argument.  *Elba Twp v Gratiot Co Drain Comm'r*, 491 Mich 924 (2012).

---

[9] Osborn moved to intervene individually and as trustee of the Osborn Trust.

## III. STANDARD OF REVIEW

We review de novo a trial court's decision to grant or deny summary disposition. *Debano-Griffin v Lake Co*, 493 Mich 167, 175; ___ NW2d ___ (2013). Whether due process has been afforded is a constitutional issue that is reviewed de novo. *People v Wilder*, 485 Mich 35, 40; 780 NW2d 265 (2010). Likewise, whether a court has subject-matter jurisdiction is a question of law reviewed de novo. *Lapeer Co Clerk v Lapeer Circuit Judges*, 465 Mich 559, 566; 640 NW2d 567 (2002). Questions of statutory interpretation are also reviewed de novo. *Detroit v Ambassador Bridge Co*, 481 Mich 29, 35; 748 NW2d 221 (2008). Though our review of the issues presented is thus de novo, we are also mindful of our previous declaration that, in general, "[w]e . . . are not inclined to reverse [drain] proceedings . . . absent [a] showing of very substantial faults." *In re Fitch Drain No 129*, 346 Mich 639, 647; 78 NW2d 600 (1956).

## IV. ANALYSIS

### A. PETITION SIGNATURES

Plaintiffs first contend that they are entitled to relief because the Kellogg petition, which served as the basis for the "board of determination" meeting at which the maintenance, improvement, and consolidation project was authorized, was signed by only 5 property owners, not the 50 that plaintiffs say are mandated by the Drain Code. There are three sections of the Drain Code directly relevant to this issue. The first, MCL 280.191, addresses maintenance and improvement of county drains. It states, in part:

> When a drain or portion thereof . . . needs cleaning out, relocating, widening, deepening, straightening, tiling, extending, or relocating along a highway, or requires structures or mechanical devices that will properly purify or improve the flow of the drain or pumping equipment necessary to assist or relieve the flow of the drain, or needs supplementing by the construction of 1

11

or more relief drains which may consist of new drains or extensions, enlargements, or connections to existing drains, or needs 1 or more branches added thereto, any *5 or at least 50% of the freeholders* if there are less than 5 freeholders whose lands shall be liable to an assessment for benefits of such work, may make petition in writing to the commissioner setting forth the necessity of the proposed work . . . . [MCL 280.191 (emphasis added).]

Absent from MCL 280.191 is any reference to "consolidation." The second section, MCL 280.441, addresses consolidation of drainage districts. It states, again in part:

Two or more drainage districts located . . . in the same drainage basin or in adjoining basins, may consolidate and organize as a single drainage district upon the filing of a petition for consolidation with the drain commissioner of the county setting forth the reason for the proposed consolidation. . . . The petition shall be signed by at least *50 property owners* within the proposed consolidated drainage district. If in the proposed consolidated drainage district there are less than 100 property owners, the petition shall be signed by at least 50% of the property owners in the proposed consolidated drainage district. [MCL 280.441(1) (emphasis added).]

The Code thus provides distinct signature requirements for drain maintenance and improvement on one hand and drainage-district consolidation on the other. But MCL 280.194 muddles this apparent dichotomy a bit:

In any petition filed under this chapter it shall not be necessary for the petitioners to describe said drain other than by its name or to describe its commencement, general route and terminus. For any work necessary to be done in cleaning out, widening, deepening, straightening, *consolidating*, extending, relocating, tiling or relocating along a highway, or for providing structures or mechanical devices that will properly purify or improve the flow of the drain or pumping equipment necessary to assist or relieve the flow of the drain or needs supplementing by the construction of 1 or more relief drains which may consist of new drains or extensions, enlargements or connections to existing drains, or needs 1 or more branches added thereto, and for any and all such proceedings, *only 1 petition and proceeding shall be necessary*. [Emphasis added.]

The trial court concluded that MCL 280.194 and MCL 280.441 were irreconcilable, that the former provision prevailed, and that therefore only five signatures are required when

12

a petition, like the one at issue, deals with consolidation as well as some other maintenance or improvement delineated in MCL 280.194. The Court of Appeals disagreed. It determined that, when a combined consolidation and maintenance-or-improvement petition is at issue, the 50-signature requirement remains as to the consolidation.

Both lower courts, in our judgment, erred by reaching the merits of this issue. As previously stated, MCL 280.161, governing the certiorari process, stipulates that "[i]f no certiorari be brought within the [prescribed time frame], the drain shall be deemed to have been legally established, and the taxes therefor legally levied, and the legality of said drain and the taxes therefor shall not thereafter be questioned in any suit at law or equity[.]" It is undisputed that plaintiffs did not seek certiorari and that the time for doing so has expired. The statute contemplates that, once the period during which certiorari may be sought has passed, no other avenue of relief is available to challenge drain proceedings. But this Court has consistently refused "to accept the proposition that certiorari is an exclusive remedy under the drain law . . . ." *Pere Marquette R Co v Auditor General*, 226 Mich 491, 494; 198 NW 199 (1924). Indeed, a review of our prior jurisprudence demonstrates that we have historically exercised equitable jurisdiction, in spite of the prohibition in MCL 280.161, when a plaintiff alleges a constitutional infirmity[10] in the proceedings surrounding a drainage project.[11] See, e.g., *Blades v Genesee Co Drain Dist No 2*, 375 Mich 683, 693; 135 NW2d

---

[10] Neither plaintiffs nor the Commissioner challenge the validity of this exception to the MCL 280.161 prohibition.

[11] We have also, in the past, indicated that exercise of equitable jurisdiction notwithstanding the Drain Code's prohibition may be appropriate in cases of fraud. See, e.g., *Detroit Beach Betterment Committee v Monroe Co Drain Comm'r*, 355 Mich 292, 295; 93 NW2d 922 (1959) (noting that the complaint contained "no allegations of fraud with respect to the drain

420 (1965) (stating that it was appropriate to exercise equitable jurisdiction notwithstanding the certiorari process when denial of "such opportunity is no more nor less than a denial of constitutionally guaranteed due process"); *Fuller v Cockerill*, 257 Mich 35, 39; 239 NW 293 (1932) (permitting a challenge to drain proceedings because those proceedings violated the constitution); *Crandall v McElheny*, 146 Mich 191, 192; 109 NW 261 (1906) ("Unless there is some constitutional objection to the application of [the predecessor of MCL 280.161] . . . , it prevents the maintenance of this suit.").[12]

In *Clarence Twp v Dickinson*, 151 Mich 270; 115 NW 57 (1908), the township in which a drain was to be extended and several property owners whose lands were within the assessment district for the proposed drainage project brought a suit in equity, contending that the project amounted to the construction of a new drain. Under the statute in place at the time, a petition urging construction of a new drain was to be signed by five persons liable for

---

commissioner's actions and proceedings entitling plaintiffs to a review in equity"); *Hudlemyer v Dickinson*, 143 Mich 250, 256; 106 NW 885 (1906) ("If fraud in the proceedings is alleged and pointed out . . . such charges may be investigated [in equity].") (quotation marks omitted). But because plaintiffs do not allege fraud here, we do not pass on the validity of this exception, if indeed it even constitutes a distinct exception to the MCL 280.161 prohibition.

[12] Though many of these cases were decided under earlier iterations of MCL 280.161 (which was not codified as such until 1956), all the earlier iterations contained language regarding the exclusivity of certiorari review that was substantially similar to the current statute. The earliest version of this statute, enacted in 1897, provided that "[i]f no certiorari be brought within the time herein prescribed, the drain shall be deemed to have been legally established, and its legality shall not thereafter be questioned in any suit at law or equity[.]" 1897 PA 254, ch V, § 3. This language remained unchanged until 1927, when it was amended to its current form: "If no certiorari be brought within the time herein prescribed, the drain shall be deemed to have been legally established *and the taxes therefore legally levied*, and *the legality of said drain and the taxes therefor* shall not thereafter be questioned in any suit at law or equity[.]" 1927 PA 331, ch VI, § 11 (emphasis added).

14

an assessment for benefits from the project. The petition under which the project at issue was initiated had been signed by only three such persons. Concluding that equitable relief is available to plaintiffs challenging drainage proceedings in only extremely narrow circumstances, we stated that a "lack of jurisdiction which will warrant relief in equity must arise from a violation of the Constitution." *Clarence Twp*, 151 Mich at 272. Regarding the petition-signature requirement, we held:

> The Constitution does not require the petition to be signed by five property owners liable to assessments for benefits. That requirement is purely statutory. The legislature might have dispensed with it altogether. It therefore possessed ample constitutional authority to declare how objections to its non-observance should be made. It had authority to declare that objections not so raised should be disregarded. It exercised that authority by the statute under consideration. That statute is therefore constitutional in its application to this case and it prevents complainants maintaining this suit. [*Id.* at 273.]

We relied heavily on *Clarence Twp* in *Stellwagen v Dingman*, 229 Mich 159, 161-162; 200 NW 983 (1924), in which we held that the alleged failure of a petition to "correctly stat[e] the purpose for which the cleaning out of the drain was needed" did not rise to the level of a constitutional violation allowing the exercise of equitable jurisdiction.

The slightly earlier case of *Strack v Miller*, 134 Mich 311; 96 NW 452 (1903), is to the same effect. In *Strack*, the plaintiff sought to enjoin the construction of a new drain on the grounds of insufficient petition signatures. The relevant statute, it was contended, required that 5 of the 10 signatories to the petition requesting the work own land that would be liable for an assessment of benefits, but only 4 of the 10 signatories to the petition at issue fit that description. We held that such a claim was insufficient "to call for the interposition of a court of equity." *Id.* at 313. Rather, the plaintiffs' proper course would have been to seek certiorari review under the statute. The certiorari statute, we said, offers

15

an opportunity to have a speedy hearing upon any question of jurisdiction or any question of irregularity. If the complainant had shown to the probate court that the application [to construct the drain] was fatally defective, the proceeding could have then been ended. The same result could have been reached before a board of review. This could have been accomplished without so much delay and expense as is involved in a chancery proceeding. [*Id.*]

We are presented here with a situation virtually identical to *Clarence Twp* and *Strack*. Per *Strack*, plaintiffs could easily have brought their signature complaint by way of certiorari review, at which time, had they been able to show the court that the petition "was fatally defective, the proceeding could have then been ended" and their grievance would have been satisfactorily addressed. *Id.* Their claim may not now be reviewed in equity because whether a consolidation petition must be signed by 5 property owners under MCL 280.191 and MCL 280.194 or by 50 pursuant to MCL 280.441 is, in the words of *Clarence Twp*, a "purely statutory" question regarding a "purely statutory" requirement. *Clarence Twp*, 151 Mich at 273.

Upon concluding that MCL 280.441 was applicable here and thus that 50 signatures were required for the consolidation petition, the Court of Appeals, apparently overlooking our decisions in *Clarence Twp*, *Strack*, and *Stellwagen*, went on to determine whether the exercise of equitable jurisdiction was appropriate. "Without the requisite number of signatures attached to the . . . petition," the Court of Appeals stated, "the Drain Commissioner had no authority or jurisdiction to act, and the proceedings establishing the No. 181 Consolidated Drainage District were void." *Elba Twp*, 294 Mich App at 341. Thus, the Court of Appeals concluded the trial court had properly exercised equitable jurisdiction over the matter. *Id.* In so concluding, the Court of Appeals neglected our holding in *Clarence Twp*, reaffirmed in *Fuller*, that "[t]he lack of jurisdiction which will warrant relief

16

in equity must arise from a violation of the Constitution." *Fuller*, 257 Mich at 39 (citation and quotation marks omitted). Even if there was a signature error, such error did not result in a lack of jurisdiction arising out of a violation of the Constitution.

It simply cannot be that every failure by the Commissioner or others to comply with the detailed requirements of the Drain Code deprives the Commissioner of jurisdiction in such a way as to permit invocation of the equitable jurisdiction of the judiciary. If this were the case, the exclusivity of certiorari review as set forth in MCL 280.161 would not only be restricted by our caselaw, but it would be of little general force. *Clarence Twp*, *Strack*, and *Stellwagen* make clear that an error regarding the number of petition signatures does not implicate the Constitution. Though in some sense a public official lacks jurisdiction every time he acts in a way contrary to statutes prescribing the procedures he must follow in carrying out his authority, "[t]here is a difference between a want of jurisdiction and a mistake in jurisdiction, or an error in the exercise of jurisdiction." *Altermatt v Dillman*, 269 Mich 177, 182; 256 NW 846 (1934). A failure to follow each and every requirement of the Drain Code does not warrant the exercise of equitable jurisdiction unless the failure is so egregious that it implicates constitutional concerns, which will almost always involve the deprivation of property without due process of law.[13] See *id.* at 186 (concluding, after

---

[13] Drainage-project proceedings like the instant ones do not result in a deprivation of property implicating due process rights until the property owner has actually been assessed for the project. Thus the rule, discussed in the next subsection of this opinion, see part IV(B), that due process does not even require *notice* of such proceedings until the assessment stage.

17

discussing several drain cases in which equitable jurisdiction had been exercised, that in all the cases, the "taking of property without due process of law" was at issue).

At this point, the objection might be raised that, as long as property rights are imperiled by the action, every failure to follow the letter of the Drain Code amounts to a constitutional violation because it constitutes a denial of due process of law. But it must be remembered that the Drain Code, in fact, provides a remedy for failure to comply with its technical requirements-- certiorari review. The availability of this remedy precludes a finding in circumstances such as a failure to meet a statutory signature requirement that deprivation of due process has occurred. Cf. *Patrick v Shiawassee Co Drain Comm'r*, 342 Mich 257, 263; 69 NW2d 727 (1955) (concluding that when the drain commissioner extended a project beyond the scope permitted by the order of determination, exercise of equitable jurisdiction was appropriate because there was no adequate opportunity to request certiorari review of the issue).

In this case, the Court of Appeals reasoned that the exercise of equitable jurisdiction was appropriate in part because the signature error alleged here was not amenable to correction on certiorari review. We disagree. If there was an error, it was in fact easily correctable through certiorari review. MCL 280.161 provides that if "material defect be found in the proceedings for establishing the drain, such proceedings shall be set aside." Surely this would have been an appropriate and adequate remedy here. Indeed, this is the very relief sought by plaintiffs. As we stated in *Strack*, certiorari is the exclusive avenue of review for such a claim.[14] See *Strack*, 134 Mich at 313.

---

[14] In determining that the exercise of equitable jurisdiction was appropriate here, the Court of Appeals relied in part on our decision in *Grand Rapids & I R Co v Round*, 220 Mich 475;

Plaintiffs also contend that the notice issued regarding the May 4, 2010 Board meeting was defective and amounted to a violation of their constitutional right to due process. Their primary complaint regarding the notice is that some of the property that would be affected by the proposed project lay outside the townships listed in the notice.[15] This, plaintiffs argue, led some property owners who stood to be assessed for the project but whose property did not lie within the listed townships to conclude that, despite the opening language of the notice, which stated that it was being sent to persons "liable for an assessment," their interests would not be affected by the proceedings at the May 4, 2010 Board meeting. Thus, they argue, notice to these persons regarding the meeting was ineffective and their constitutional right to due process was violated.

Unlike the signature issue, true questions of due process may be heard in equity because they implicate the constitutional exception to MCL 280.161. See *Blades*, 375 Mich at 693-694 (concluding that an argument that an assessment was arbitrarily and wrongly

190 NW 248 (1922). In *Round*, we said that a drain petition failed to confer jurisdiction because it did not allege, as required by the statute in place at the time, that the signatures on the petition included at least ⅓ of the property owners whose lands were traversed by the drain in question. But *Round* was *brought as a petition for certiorari*; it was not an attempt to invoke equity. Contrary to the Court of Appeals' analysis, then, *Round* actually underscores that such errors are properly addressed through certiorari review. Additionally, *Round* did not assert that the error at issue amounted to a lack of jurisdiction that *arose out of a violation of the Constitution* and thus does not imply that an exercise of equitable jurisdiction would have been appropriate. Indeed, this requirement from *Clarence Twp* and *Fuller*, coupled with the reaffirmation of the *Strack* and *Clarence Twp* principle in *Stellwagen*-- which was decided after *Round*-- demonstrates that an error like that found in *Round* is insufficient to permit the intervention of equity.

[15] The notice enumerated only those townships through which the No. 181-0 drain actually runs.

19

imposed was a due-process claim that could be heard in equity); *Altermatt*, 269 Mich at 186 (summarizing relevant caselaw and concluding that drain proceedings that amount to "taking of property without due process of law" confer jurisdiction on courts of equity); *Fuller*, 257 Mich at 38-39 (concluding that an exercise of equitable jurisdiction was appropriate when the defendants were "wholly without authority" to construct a drain because "the ultimate result of assessment of benefits and the collection from plaintiffs of the drain tax would be to deprive them of their property without due process of any sort").

To comport with due process, notice, when required, must be "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Sidun v Wayne Co Treasurer*, 481 Mich 503, 509; 751 NW2d 453 (2008), quoting *Mullane v Central Hanover Bank & Trust Co*, 339 US 306, 314; 70 S Ct 652; 94 L Ed 865 (1950). To be sure, the notice sent to plaintiffs in this case was no model of clarity. But before analyzing the reasonableness of the notice, we must ask the threshold question whether plaintiffs were constitutionally entitled to *any* notice of the May 4, 2010 Board meeting. We conclude that they were not.

Under Michigan's Constitution, "[n]o person shall . . . be deprived of life, liberty or property, without due process of law." Const 1963, art 1, § 17. The United States Constitution similarly provides that no state shall "deprive any person of life, liberty, or property, without due process of law[.]" US Const, Am XIV. The May 4, 2010 Board meeting was held to determine the "necessity" of the proposed drainage project. See MCL 280.72(3) and MCL 280.441(1). Simply put, the meeting did not pertain to deprivation of

20

life, liberty, or property, and thus the due process right to notice was not implicated.[16] The meeting dealt only with whether the drainage project was *necessary* under the terms of the Drain Code and thus whether it should proceed. As such, due process did not require that *any* notice be given.

*Chicago, M, S P, & P R Co v Risty*, 276 US 567; 48 S Ct 396; 72 L Ed 703 (1928), bears a striking resemblance to the present case. In *Risty*, the plaintiffs, receivers of a railway company, sought to enjoin the apportionment and assessment of benefits against their land for the maintenance of a drain constructed under South Dakota's agricultural drainage statutes. South Dakota law at the time, like our own Code, prescribed a bifurcated system under which an initial determination as to whether the drainage project would be "conducive to the public health, convenience, or welfare, or necessary or practical for draining agricultural lands" was followed by separate proceedings regarding the apportionment of benefits and assessment of costs against property owners. *Id.* at 574 (citation and quotation marks omitted). The plaintiffs challenged the constitutionality of the proceedings "on the ground that the notice of the hearing on the petition for the establishment of the drainage project fell short of constitutional requirements," asserting that, because the notice of the hearing on necessity described only the route to be taken by the proposed drain "and the tract of country likely to be affected thereby in general terms," it was insufficient "notice to any land owner other than those through whose land the drainage

---

[16] Indeed, at the May 4, 2010 meeting, the Board was performing an essentially legislative function-- determining whether to authorize a public-works project. See *Blankenburg v City of Northfield*, 462 NW2d 417, 419 (Minn App, 1990) (holding that a hearing on the feasibility of extension of sewer and water lines constitutes "a legislative function").

21

ditch is to be constructed." *Id.* at 573 (quotation marks omitted). The United States

Supreme Court rejected the argument, holding:

> Due process of law does not require notice of a proceeding to determine merely whether an improvement shall be constructed without at the same time establishing the boundaries of the assessment district. It is enough if land owners who may be assessed are later afforded a hearing upon the assessment itself. [*Id.* at 574.][17]

Citing *Risty*, the United States Supreme Court held in *Utley v St Petersburg*, 292 US 106,

109; 54 S Ct 593; 78 L Ed 1155 (1934), that "[t]here is no constitutional privilege to be

---

[17] *Risty* implies that due process may require notice of the establishment of an "assessment district." An "assessment district" of the type referred to in *Risty* should not be confused with the establishment (or, as here, consolidation) of a "drainage district" under our Drain Code. *Risty* explains that inclusion of lands within an "assessment district" as contemplated in that case "depended wholly upon [the lands'] being benefited by the proposed improvements" and therefore being assessed to fund the project. *Risty*, 276 US at 575. By contrast, there is no indication in the Drain Code that inclusion within a drainage district means that a specific parcel of land will certainly be benefited by and assessed for the costs of a given project. To the contrary, "[a]ll apportionments of benefits . . . shall be upon the principle of benefits derived." MCL 280.152. As *Risty* itself said, "It is enough if land owners who may be assessed are later afforded a hearing upon the assessment itself." *Risty*, 276 US at 574.

This understanding of *Risty* is supported by prior precedent of both this Court and the United States Supreme Court. In *Voigt v Detroit*, 184 US 115; 22 S Ct 337; 46 L Ed 459 (1902), the plaintiff, a Michigander challenging an assessment of taxes against his property to pay for the construction of a road, contended that the Fourteenth Amendment had been violated because he was not given notice of, or an opportunity to contest, the setting of the boundaries of the district within which property owners would be assessed to pay for the road because of the benefit they received from the project. He was, however, given the opportunity to contest the individual assessment ultimately levied against his property. This Court affirmed the trial court's dismissal of the complaint. The United States Supreme Court in turn affirmed our decision, holding, with regard to the Michigan statute that created this system of assessment, that "[i]t would be difficult to find any provision fairer than this in purpose and which so essentially satisfies every requirement of due process of law." *Id.* at 122.

22

heard in opposition at the launching of a project which may end in an assessment.  It is enough that a hearing is permitted before the imposition of the assessment as a charge upon the land, or in proceedings for collection afterwards."[18]  (Citations omitted.)

Our own precedents are in accord with this position.  The plaintiff in *Roberts v Smith*, 115 Mich 5; 72 NW 1091 (1897), owned property subject to assessment for a drainage project.  He contended that the drain law in place at the time violated constitutional due process because it did not afford him an opportunity "to contest the public necessity for the drain . . . ."  *Id.* at 8.  We rejected the argument, noting that the drain law "provide[d] for notice of the assessment, and an opportunity to be heard thereon."  *Id.*  We later reaffirmed this principle in *Hinkley v Bishop*, 152 Mich 256, 259-260; 114 NW 676 (1908), in which we stated that "persons liable to be assessed for benefits" have "no constitutional right to be

---

[18] *Goodrich v Detroit*, 184 US 432; 22 S Ct 397; 46 L Ed 627 (1902), is to the same effect. There, the plaintiffs were ultimately assessed to pay for part of a road project in Detroit. They asserted that their right to due process had been violated where the statute at issue provided that, regarding the initial proceedings to determine whether the project would go forward, notice only had to be given to those property owners whose property would be condemned in order to build the street.  Those who might be assessed were not given notice. This Court affirmed the trial court's dismissal of the plaintiffs' claim, and the United States Supreme Court affirmed, reasoning:

> It might be argued upon the same lines [as those advanced by the plaintiffs] that, whenever the city contemplated a public improvement of any description, personal notice should be given to the taxpayers, since all such are interested in such improvements and are liable to have their taxes increased thereby.  It might easily happen that a whole district or ward of a particular city would be incidentally benefited by a proposed improvement, as, for instance, a public school, yet to require personal notice to be given to all the taxpayers of such ward would be an intolerable burden.  Hence it has been held by this court that it is only those whose property is proposed to be *taken* for a public improvement that due process of law requires shall have prior notice.  [*Id.* at 438.]

23

heard upon the necessity for the drain," citing *Roberts*. At the same time, we granted relief to some of the *Hinkley* plaintiffs because they had not been properly noticed regarding the *assessment* proceedings. *Id*. at 262, 264-266.

Therefore, plaintiffs were not constitutionally entitled to notice regarding the hearing on the necessity and conduciveness of the drainage project.[19] They *were* constitutionally entitled to notice regarding assessment. That is, under the present circumstances, they were entitled to notice that the day of review would be held. They received such notice. Plaintiffs' complaints regarding the notice issued for the May 4, 2010 hearing, even assuming they had merit, were remedied in the notice issued for the February 14, 2011 day of review. For these reasons, plaintiffs' claim of inadequate notice fails.

## V. CONCLUSION

The lower courts improperly exercised equitable jurisdiction over the signature-requirement issue given that the matter did not arise from a violation of the Constitution. The lack of jurisdiction that will warrant relief in equity must arise from a violation of the Constitution. Because the exercise of equitable jurisdiction over the signature-requirement

---

[19] Plaintiffs were, however, statutorily entitled to notice of the "board of determination's" hearing on necessity and conduciveness. But the notice they received regarding that hearing met the statutory requirements. MCL 280.72(2), applicable via the terms of MCL 280.191, requires, regarding individual property owners, that "[t]he drain commissioner . . . send notice, by first class mail, of the time, date, and place of the meeting, to each person whose name appears on the last city, village, or township tax assessment roll as owning land within the special assessment district, at the address shown on the roll." Regarding townships, notice "shall be served . . . on the clerk of each township, . . . personally or by registered mail, at least 10 days before the meeting." MCL 280.72(2). There is no indication that these provisions were not complied with here. Further, for reasons already explained, a purely statutory defect would not amount to a *constitutional* violation. The proper remedy for any error in this regard would have been certiorari review.

issue was improper, we do not reach the issue whether the Drain Code requires 5 or 50 signatures for a drainage-district consolidation petition. Finally, though it was within the lower courts' equitable jurisdiction to address the notice issue, we conclude that constitutional due process did not entitle plaintiffs to receive notice of the "board of determination" hearing. Though constitutional due process entitles affected property owners to notice of proceedings concerning assessments for the costs of a drainage project, there is no parallel right to notice of proceedings to determine whether the project will be undertaken in the first place. For these reasons, we reverse the judgment of the Court of Appeals and reinstate the trial court's order granting summary disposition in favor of the Commissioner.

Stephen J. Markman
Robert P. Young, Jr.
Michael F. Cavanagh
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack

VIVIANO, J., took no part in the decision of this case.

25